Consol. Nos. 14-1086 (L) & 14-1136
_____

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

PROFESSIONAL MASSAGE TRAINING CENTER, INC.,
a Missouri Corporation,

Appellee and Cross-Appellant

vs.

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES
d/b/a The Accrediting Commission of Career Schools and Colleges,
a Virginia Corporation

Appellant and Cross-Appellee
_____

On Appeal from the United States District Court
For the Eastern District of Virginia
1:12-cv-00911-LO-IDD


**APPELLEE'S PRINCIPAL BRIEF AND RESPONSE BRIEF**

Ronald L. Holt
  *Counsel of Record*
Julie G. Gibson
Matthew L. Hoppock
**DUNN & DAVISON, LLC**
1100 Walnut St., Ste 2900
Kansas City, MO 64106
(816) 292-7600
*Counsel for Appellee and Cross-Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1086__      Caption: __PMTC vs. ACCSC_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Professional Massage Training Center, Inc._____
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                    ☐ YES ☑ NO
        If yes, identify all such owners:

# **Table of Contents**

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE CASE AND OF THE FACTS ...........................3

    I.    EVENTS LEADING TO THIS LAWSUIT AND PROCEEDINGS IN THE DISTRICT COURT ...............................................................3

    II.    PMTC'S HISTORY AND REGULATORY APPROVALS ...............................4

    III.    NATURE OF RELATIONSHIP BETWEEN PMTC AND ACCSC ..................5

    IV.    PMTC'S STUDENT GRADUATION AND EMPLOYMENT OUTCOMES .........6

    V.    PMTC'S MANAGEMENT PRIOR TO 2010 ...............................................7

    VI.    DOE ISSUES THAT WERE RESOLVED BY THE MIDDLE OF 2011 ............8

    VII.    ACCREDITATION ACTIONS LEADING UP TO DECEMBER 2011 PROBATION ORDER ....................................................................9

    VIII.    DECEMBER 2011 PROBATION ORDER AND PMTC'S RESPONSE ...........11

    IX.    DENIAL DECISION FINDINGS COMPARED TO THE RECORD....................12

        A.    Management Capability ............................................................12

        B.    Continuity of Management & Administration..........................15

        C.    Learning Resource System (LRS) ...........................................18

        D.    Faculty Background Verification..............................................22

    X.    BIAS OF KEY ACCSC MANAGERS .....................................................24

    XI.    ACCSC PROCESS IRREGULARITIES .....................................................28

    XII.    DAMAGES PMTC SUFFERED AFTER JULY 11, 2012 .............................33

SUMMARY OF THE ARGUMENT ....................................................38

ARGUMENT .......................................................................................42

    I.    STANDARD OF REVIEW ON APPEAL .....................................................42

II.   THE DISTRICT COURT APPLIED THE CORRECT STANDARD FOR
      REVIEW IN FINDING ACCSC DENIED PMTC DUE PROCESS, AND
      THE DISTRICT COURT'S RULING IS SUPPORTED BY THE RECORD
      BEFORE THE COMMISSION AND THE EVIDENCE AT TRIAL
      CONCERNING ACCSC'S ACTIONS IN THE ACCREDITATION
      PROCESS. ............................................................42

      A.   When Actual Bias is Demonstrated, Even "Great
           Deference" Cannot Resuscitate an Erroneous
           Accreditation Decision. ..........................................42

      B.   Regulatory Changes in 2010 Reduced the Degree of
           Deference Owed to Accreditation Decisions, and the
           Cases That Precede That Change Are Not Binding. ................48

      C.   The District Court's Findings of "Ampl[e]" Bias and
           Arbitrary Adjudication Were Far From Erroneous. .................51

      D.   When the Staff Bias is Removed From the Process,
           PMTC is Quite Plainly a Well-Run School With
           Excellent Student Outcomes. ....................................55

III.  THE DISTRICT COURT UNDERVALUED THE DAMAGES AWARD BY
      FAILING TO DISTINGUISH BETWEEN FIXED AND VARIABLE
      COSTS, AND THE COURT SHOULD HAVE AWARDED $1,408,656 IN
      LOST PROFITS. ........................................................57

IV.   THE DISTRICT COURT SHOULD HAVE FOUND THAT ACCSC HAD
      AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING UNDER
      VIRGINIA LAW AND THAT IT BREACHED THAT DUTY BY ITS DUE
      PROCESS VIOLATIONS .................................................61

V.    THE DISTRICT COURT SHOULD HAVE FOUND THAT MISSOURI
      TORTIOUS INTERFERENCE LAW DOES NOT SUPPORT A FINDING
      OF JUSTIFICATION FOR IMPROPER ACTION TAKEN BY AN
      ACCREDITING BODY DUE TO BIAS .....................................63

CONCLUSION ...................................................................65

# Table of Authorities

## Cases

*Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc*.,
    155 S.W.3d 50 (Mo. 2005) .................................................................. 57, 59

*Anderson v. City of Bessemer City, N.C.*,
    470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) .............................51

*Auburn Univ. v. S. Ass'n of Colleges & Sch., Inc*.,
    489 F. Supp. 2d 1362 (N.D. Ga. 2002).........................................................44

*Baldwin Properties, Inc. v. Sharp*,
    949 S.W.2d 952 (Mo. Ct. App. 1997) ...........................................................62

*Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc*.,
    2009 U.S. Dist. LEXIS 23651 (E.D. Va. Mar. 18, 2009).............................61

*Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career
    Sch. & Colleges*, 44 F.3d 447 (7th Cir. 1994) ........................................ 42, 61

*Cohen v. Express Fin. Servs., Inc*.,
    145 S.W.3d 857, 865-66 (Mo. Ct. App. 2004).............................................63

*Enomoto v. Space Adventures, Ltd*.,
    624 F. Supp. 2d 443 (E.D. Va. 2009) ...........................................................60

*Escuela de Medicina San Juan Bautista, Inc. v. Liaison Comm. on Med. Educ*., 820
    F. Supp. 2d 317 (D.P.R. 2011) ......................................................... 44, 45, 50

*Fine Mortuary Coll., LLC v. Am. Bd. of Funeral Serv. Educ., Inc*.,
    473 F. Supp. 2d 153  (D. Mass. 2006).................................................... 42, 44

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001) ................................................................ 42, 43

*Hiwassee Coll., Inc. v. S. Ass'n Of Colleges And Sch*.,
    531 F.3d 1333 (11th Cir. 2008) ............................................................ 42, 50

*JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc*.,

245 F. Supp. 2d 749 (E.D. Va. 2002) ...........................................................57

*Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc.*,
    556 F.2d 78 (1st Cir. 1977)..............................................................45

*Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
    142 F.3d 26 (1st Cir. 1998)..............................................................42

*Med. Inst. of Minnesota v. Nat'l Ass'n of Trade & Technical Sch.*,
    817 F.2d 1310 (8th Cir. 1987) ................................................... 44, 45

*Penn. Life Ins. Co. v. Bumbrey*,
    665 F.Supp. 1190 (E.D.Va.1987) .....................................................60

*Resolution Trust Corp. v. Maplewood Invs.*,
    31 F.3d 1276 (4th Cir. 1994) ...........................................................41

*Sales v. Grant*,
    224 F.3d 293 (4th Cir. 2000) ...........................................................51

*Thomas M. Cooley Law Sch. v. ABA*,
    459 F.3d 705 (6th Cir. Mich. 2006)..................................................42

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.*,
    156 F.3d 535 (4th Cir.1998) ............................................................60

*W. State Univ. of S. California v. Am. Bar Ass'n*,
    301 F. Supp. 2d 1129 (C.D. Cal. 2004)....................................... 44, 45

*Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges &*
    *Sch.*, 957 F.2d 210 (5th Cir. 1992) ..................................................43

**Statutes**

20 U.S.C. § 1099b(a)(6)............................................................................48

20 U.S.C. § 1099b(f)................................................................................44

Higher Education Amendments of 1992, PL 102-325, July 23, 1992,
    106 Stat 448 ..................................................................................44

**Other Authorities**

"Institutional Eligibility Under the Higher Education Act of 1965, as Amended, and the Secretary's Recognition of Accrediting Agencies," 74 Fed. Reg. 55414-01, 55417 ....................................................................................49

Fed. R. Civ. P. 52(a)...............................................................................41

H. Kent Munson, Fixed Overhead Expenses: Gremlins of Lost Profits Damages, 56 J. Mo. B. 104 (March–April 2000).............................................................57

**Regulations**

34 C.F.R. § 602.25(f) ..............................................................................48

34 C.F.R. 602.25(f) .................................................................................49

## JURISDICTIONAL STATEMENT

Professional Massage Training Center, Inc. ("PMTC") brought this action against Accreditation Alliance of Career Schools and Colleges d/b/a The Accrediting Commission of Career Schools & Colleges ("ACCSC"), seeking declaratory and injunctive relief and an award of damages based on several causes of action, including violation of due process of law, after ACCSC wrongfully terminated PMTC's accreditation. The District Court's subject matter jurisdiction arose from 28 U.S.C. §§ 1332 and 2201. Following a four-day bench trial, the District Court ruled in favor of PMTC on Count I of its Amended Complaint and awarded declaratory relief and damages, but ruled against PMTC on Counts II through VI. Specifically, the District Court determined that ACCSC indeed wrongfully terminated PMTC's accreditation and ordered that it reinstate the school, but the court did not award the full amount of damages that PMTC sought.

ACCSC timely appealed from the District Court's January 17, 2014 final judgment, and PMTC timely cross-appealed.   ACCSC seeks review of the District Court's ruling in favor of PMTC on Count I, including all relief awarded. PMTC's challenges the District Court's rejection of Counts II to VI of the Amended Complaint and the amount of damages awarded.  This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES PRESENTED ON CROSS-APPEAL

I.   Whether the District Court erred as a matter of law in holding that Virginia contract law does not impose a duty of good faith and fair dealing in contracts, and when it concluded that PMTC did not establish a breach of contract, in spite of evidence that the agreement between ACCSC and PMTC required ACCSC to apply its standards fairly and consistently to PMTC and where the District Court found as a matter of fact that ACCSC had not done so?

II.  Whether the District Court committed legal error in holding that PMTC could not prove ACCSC lacked justification in interfering with PMTC's contracts where the District Court failed to discuss whether the palpable bias the District Court found as a matter of fact amounted to "improper means," which, under Missouri law, proves lack of justification?

III. Whether the District Court committed legal and factual error in limiting PMTC's lost-profits damages when it failed to subtract additional fixed costs PMTC would not have to pay as it added additional students under the projection, resulting in a higher profit margin per student, as projected by PMTC's damages expert and where both Virginia and Missouri law prevent courts from deducting fixed costs from lost profits damages?

## STATEMENT OF THE CASE AND OF THE FACTS

### I.    Events Leading to this Lawsuit and Proceedings in the District Court

This case arose from the March 7, 2012 decision of ACCSC, a national accrediting agency recognized by the U.S. Department of Education ("DOE"), to deny PMTC's application for renewal of its accreditation (the "Denial Decision"). JA 2374-85.  PMTC timely appealed the Denial Decision to an ACCSC appeals panel, which upheld the Denial Decision in a July 11, 2012 ruling letter (the "Appeal Ruling").  JA 2574-93. PMTC filed this case on August 16, 2012 to obtain declaratory and injunctive relief and damages. JA 21-60.

Following an evidentiary hearing, the District Court on September 17, 2013 granted PMTC's motion for a preliminary injunction, ordering ACCSC to reinstate PMTC's accreditation in a probationary status pending a decision on the merits. JA 61-67. The injunction order, and an October 31, 2012 clarifying order, required PMTC to inform all existing and prospective students that its accreditation remained under review; that its accreditation might ultimately be revoked; and that revocation of accreditation would result in PMTC losing access to federal student aid. JA 67, 69. The case proceeded to a bench trial on July 15-18, 2013, and, on January 17, 2014, the District Court issued a memorandum ruling ordering ACCSC to issue a five-year grant of accreditation to PMTC effective November 2010 and awarding actual damages of $429,016.62. JA 1-20.

## II.    PMTC's History and Regulatory Approvals

PMTC is a small single-discipline massage therapy school located in Springfield, Missouri. PMTC was established in 1994 by Juliet Mee, an experienced massage therapist who taught individual massage courses and who also served for ten years as the education representative on the Missouri Board of Therapeutic Massage ("BTM"). JA 576-77 (Tr 339-40, Mee). With Ms. Mee as its constant owner and director, JA 574-75 (Tr 337-38 Mee), PMTC received its five-year initial and first renewal grants of accreditation from ACCSC effective as of, respectively, November 2000 and November 2005. JA 577-78 (Tr 340-41, Mee). The adequacy of PMTC's management was not questioned during those accreditation cycles or at any other time until PMTC's third ACCSC accreditation cycle beginning in early 2010.

Accreditation is important because it enabled PMTC in 2004 to obtain DOE certification of eligibility to participate in the federal student aid programs under Title IV of the Higher Education Act, 20 U.S.C. §§ 1070 et seq. (the "Title IV Programs"). JA 620 (Tr. 383). With federal student aid available to assist lower income students, PMTC's student population grew to an average of 80 to 100 students a year. JA 251.[1] PMTC continuously participated in the Title IV Programs until it lost its ACCSC accreditation on July 11, 2012 as a result of the ACCSC

---

[1] At the time of an August 2010 ACCSC evaluation visit, the school was reported to have 113 students. JA 251.

4

Appeal Ruling. PMTC regained participation in the Title IV Programs in early October 2012 following reinstatement of its ACCSC accreditation pursuant to the preliminary injunction entered by the District Court. PMTC's program participation agreement (PPA) with the DOE, JA 2108-24 (executed PPA), required PMTC, among other things, to maintain accreditation with an accrediting body recognized by the DOE. JA 621-23 (Tr 384-86, Mee), JA 2111, 2920 (PEx 109).

## III.    Nature of Relationship Between PMTC and ACCSC

As former ACCSC Commissioner Kristi Mollis testified, "the relationship between an accredited institution that is ACCSC accredited and the agency, ACCSC, involves a commitment on both sides." JA 799.  In order to obtain accreditation from ACCSC, a postsecondary institution must go through a process of submitting an application, preparing and submitting a self-evaluation report (SER) and then undergoing an evaluation visit by an ACCSC evaluation team. Through that process, the institution must demonstrate compliance with ACCSC substantive standards. JA 229-01; 799-01.  ACCSC, on the other hand, must "fairly and consistently review those submissions" from an institution and "apply its standards fairly." JA 800. This relationship was viewed by ACCSC as "an agreement between the schools and the accrediting agency," JA 799, and PMTC also understood it was making "commitments to ACCSC," JA 597, concerning

fees, reports and compliance with standards. ACCSC Executive Dr. Michale

McComis also agreed that, under ACCSC's standards, ACCSC has a duty to treat

schools fairly and consistently. JA 391.

## IV.    PMTC's Student Graduation and Employment Outcomes

Prior to the revocation of its accreditation, PMTC was one of the best

schools ACCSC accredited with respect to the employment of graduates.  For the

2011 reporting year, PMTC's employment rate of 95% ranked 42 out of 782

schools, SJA93 (Tr , PEx 555), significantly better than  the ACCSC benchmark

rate of 70%. JA4898.  As the District Court observed in its decision, PMTC's

employment rates were "excellent." JA11.  Its graduation rates were also above-

average for ACCSC schools, with 74.4% of students graduating in 2011, which

ranked 259 out of all 782 schools, SJA80 (PEx555), while the ACCSC benchmark

was 54% . JA4898.

ACCSC's Appeal Denial acknowledged that PMTC's outcomes metrics

were exemplary, although ACCSC decided that they were irrelevant in determining

whether PMTC should retain accreditation. JA 2579, 2584-85 (DEx 65, 7-11-12

letter). ACCSC Executive Director Dr. Michale McComis, however, stated in his

doctoral dissertation, which was based on ACCSC member institutions, that

"leadership matters in relation to student achievement" and "leadership

characteristics affect graduate employment directly through those actions that

affect student program completion." JA 389. PMTC also had low federal student

loan default rates, JA 2906, which indicate that students were graduating, getting

jobs and paying back their loans. *See* JA 1126.

## V.    PMTC's Management Prior to 2010

In an attempt to justify its termination of PMTC's accreditation, ACCSC

included a footnote in the Denial Decision asserting that PMTC had management

problems going back to 2005. JA 2374, Fn. 2.  The record before the ACCSC

Commission, however, establishes only that in 2006 PMTC was asked to

demonstrate that several new management policies, procedures and computer

software were "having a positive impact such that the school demonstrates ongoing

compliance with accrediting standards," JA 2967.  The record further shows that

PMTC satisfied this request because it was granted a five year renewal term

without any limitations or expressions of concern by the Commission.  JA 4034,

616-17 (Mee Testimony). There is nothing in the record to indicate that any other

regulatory agency exercising jurisdiction over PMTC expressed any concerns

about any aspects of PMTC's operations from 2006 until late 2009 when DOE

raised a financial issue caused by general economic conditions, which again was

satisfactorily addressed.[2]  JA 618

---

[2] While PMTC's accreditation did not come up for renewal until 2010, ACCSC
had the authority to direct PMTC to file monitoring reports if ACCSC had any
concern about PMTC's management or any aspect of its operations. JA 4770,

7

## VI.    DOE Issues That Were Resolved by the Middle of 2011

In late 2009, after reviewing PMTC's December 31, 2008 audited financial statements, the DOE determined that PMTC had a financial responsibility composite score below the required level of 1.5 and that it needed to establish a letter of credit (LOC) equivalent to 10% of its annual Title IV aid disbursements. The lower FY 2008 score was the result of PMTC having to self-finance the portion of student tuition not covered by federal aid after Sallie Mae and other private lenders began to exit the private student loan market in 2007-2008. JA 634. The request for a 10% LOC was a standard requirement under the DOE's financial responsibility regulations, 34 C.F.R. § 668.175 (f). After obtaining several extensions of time, PMTC posted the required LOC with the DOE on June 21, 2010. JA 578. PMTC's financial performance improved in 2009 to 2010, and the DOE released the LOC on March 24, 2011. JA 2978.

In January of 2010, DOE also performed a program review at PMTC, which again was satisfactorily resolved by PMTC by June of 2011. Program reviews are an oversight activity used by the DOE to evaluate how well institutions are

_____

ACCSC Manual, Chap. 1, Section V-D-1. ("The Commission may order a school to submit a report on its compliance with accreditation requirements … at any time the Commission believes that monitoring of compliance with an accreditation requirement is warranted.")

administering Title IV aid relative to regulatory requirements.[3]  While the DOE's

initial program review report set forth several findings of non-compliance and

proposed liabilities, ultimately, after considering PMTC's response, the DOE on

June 1, 2011 found that PMTC had resolved all areas of concern and that it only

owed $2,757 for aid that was erroneously disbursed. JA 2979-81.  In resolving the

program review, the DOE on June 21, 2011 also moved PMTC off of

reimbursement funding, known as HCM2 (heightened cash monitoring 2) back to

regular funding. JA 2107.

## VII.    Accreditation Actions Leading Up to December 2011 Probation Order

In late 2009, PMTC began the process of seeking renewal of its ACCSC

accreditation in accordance with the requirements outlined in the ACCSC Manual.[4]

Juliet Mee attended an ACCSC accreditation workshop in November 2009, and

thereafter in January 2010 filed a renewal application with ACCSC. PMTC filed its

self-evaluation report (SER) on July 8, 2010 and an evaluation team visited PMTC

on August 9-10, 2010, which was the first day of a new class start. The team

summary report (TSR) written by Courtney Moraites and edited by Lisa Miles,

both ACCSC staff members, was issued on September 23, 2010, JA 1453 (D Ex.

---

[3] 2010-11 Federal Student Aid Handbook, Vol. II, Chap.9, at p. 2-141 ("The Department conducts program reviews to confirm that a school meets FSA requirements for institutional eligibility, financial responsibility, and administrative capability.").

[4] See JA 4747, Pl. Ex 543, ACCSC Manual, Chap. 1, Section II-2.

33), and contained 13 findings.  These included four areas addressed in the Denial

Decision – management capability, management and administration continuity,

learning resource system (LRS) and verification of faculty background. PMTC

filed a comprehensive response to the TSR on October 26, 2010.  JA 1471

(DEx36)

On December 8, 2010, the Commission issued a Probation Order listing 11

findings, including the four above noted areas. JA 1781 (DEx37). After PMTC

filed its response to the Probation Order in March 2011, the Commission, in a June

8, 2011 Order, vacated the 2010 Probation Order and directed that PMTC receive a

special second evaluation visit focused on the above four areas and the institution's

Institutional Assessment and Improvement Plan ("IAIP") and its financial

condition.  Commission directed evaluation visits are rare. JA 262, 1868. The

Commission's letter directed PMTC to collect documents addressing the specified

issues in advance of the visit. PMTC did so and placed the requested documents in

two large binders, JA 3084 - 4028 (P.Ex. 154), which were given to Ms. Miles and

her team leader Molly Hager during the visit.

Miles did not have time to review the "two huge binders of information"

during the June 25, 2011 team visit, so she took them to her home, where she

reviewed them two months later. JA 2819; 268-269.  She issued a second TSR on

August 25, 2011, which contained five findings, including the four above noted

areas. JA 1875.  PMTC again filed a comprehensive response on October 8, 2011.

## VIII.    December 2011 Probation Order and PMTC's Response

After receiving the August 25, 2011 TSR, JA 1875 (D.Ex.52 ) and PMTC's

October 8, 2011 response, JA 1902 (D.Ex.53 ), the Commission issued another

Probation Order on December 7, 2011, directing PMTC to demonstrate that it was

meeting standards in four areas: (1) management capability and continuity;[5] (2) an

institutional assessment and improvement plan ("IAIP") with significant and

ongoing activities; (3) a learning resource system (LRS) managed by a qualified

person, LRS action items in the school's IAIP, and integration of the LRS into

curriculum; and (4) documentation verifying that faculty have three years of

practical work experience in subject areas. PMTC submitted an over 400 page

response to the 2011 Probation Order on January 24, 2012, JA 2168-2373

(excerpted), which included information and materials intended to resolve all four

areas specified in the Probation Order.

---

[5] Four specific aspects of management were outlined: (a) "full-time on-site
supervision by an individual or team that has the demonstrated ability to lead and
manage the institution," (b) "appropriate administrative and operational policies
and procedures," (c) "ongoing development and training activities" for
management and administrative employees; and (d) "continuity of management
and administrative capacity…through reasonable retention…." JA 2158.

11

## IX.    Denial Decision Findings Compared to the Record

At its February 2012 meetings in San Diego, the Commission denied PMTC's accreditation. Based on the record given to them by ACCSC staff, a three-commissioner panel, Panel D, consisting of Allan Sharpe as chair and Kristi Mollis and Jim Heideman as members, made a recommendation not to renew PMTC's accreditation, which the full Commission later voted unanimously to adopt. JA 438. While the Denial Decision determined that PMTC was indeed in compliance with item (2) IAIP, it found a lack of compliance in item (1) (management) and stated that this resulted in deficiencies in items (3) (LRS) and (4) (faculty verification).  JA 2374-84; 804 (Mollis). The Commission did *not* cite, as a basis for the Decision, PMTC's past DOE issues or its past problems with financial resources and late payments to vendors. JA 805-06.[6]

### A.    *Management Capability*

The ACCSC management standard states that a "school must have adequate management and administrative capacity in place that includes… [f]ull-time on-site supervision by an individual or team with the appropriate combination of education, experience, and demonstrated ability to lead and manage a post-secondary educational institution." JA 4799, ACCSC Manual, Chap. 2, § I-A-1-a.

---

[6] Dr. Kershenstein testified that, if the Commission's December 7, 2011 Probation Order did not direct PMTC to provide information about the past DOE problems or past show cause orders, then it would not have been right for the Commission to cite those issues as a basis for denying renewal of PMTC's accreditation. JA 1164.

The Denial Decision found PMTC to lack adequate management on the basis that two PMTC employees, Jeremy Beatty and Linda Mayhugh, who were promoted in December 2011 into administrator positions, did not meet PMTC's requirement of three years of related experience. JA 2379.[7]  Dr. Karen Kershenstein, ACCSC's expert witness, testified that, in making this judgment, ACCSC was not applying an accrediting standard, but rather PMTC's hiring standard. JA 116-47 (Tr 979-80). And, while the ACCSC management standard describes management as being provided by "an individual or a team," the Decision does not indicate if the Commission considered whether, notwithstanding its conclusions about Beatty and Mayhugh, PMTC enjoyed sufficient management from its director/owner Juliet Mee and her CPA brother Jeremiah Mee. [8]

According to Mollis, the Commission decided these two employees "didn't have any credentials in either of the areas." JA 807, 810.[9] The Commission stated

---

[7] The Decision also stated that the two employees "did not meet the Commission's expectations to serve in this capacity," JA 2379, but the Decision did not identify any published ACCSC standard setting forth the Commission's "expectations." Although these two employees had only been in their new management positions less than two months when the Commission made the Decision, no consideration was given by the Commission to deferring a decision about them for several months in order to receive an evaluation of their performance in these new positions. JA 816.

[8] The Decision did not question the qualifications of Juliet Mee to act as school director or the qualifications of Jeremiah Mee to act as chief financial officer. JA2378-79.; 268-69.

[9] According to Sean Forman's notes taken during the Panel D meeting, the Commissioners said that PMTC "management team has no administrative

13

that its determination was based on its review of each employee's "resume and the job description" submitted by PMTC. *Id.* But the Decision did not explain why the Commission believed it was qualified to override PMTC's judgment that the various management and other prior employment experiences of the two administrators were related to the responsibilities that PMTC itself had selected for these positions. JA 2379. [10]

Mr. Beatty, who was promoted to Compliance Administrator, a position involving regulatory relationships and oversight of school admissions, JA 2205-11, had extensive administration and compliance experience including working at PMTC for 15 months in administration and instruction, compliance administration for 15 months at another private college, and federal compliance work for a developer for over three years. JA 2099, 2180, 2212-13 (Beatty Resume), 2226 (Staff Chart). In a comment to a draft summary written during the Commission meetings in early February 2012 (where the Denial Decision was made), ACCSC's Sean Forman questioned whether it was "a stretch to say that Mr. Beatty may not have the 3 years experience in a related position?" JA 2854, 2864.

---

experience." JA 1008 (emphasis added). This statement is demonstrably false, as established in the record of what PMTC submitted about the employment experience of Beatty and Mayhugh, not to mention also Juliet Mee and Jeremiah Mee.

[10] The Commission's judgment was made solely on the basis of its interpretation of the information submitted by PMTC about Beatty and Mayhugh; it did not perform any investigation of its own on their background. JA 813-15.

Ms. Mayhugh, who was promoted to Curriculum Administrator, a position involving responsibility for oversight of the school's educational process, JA 2216-22, had worked at PMTC as a lead instructor for more than 3 years, owned her own salon business, worked as a loan officer and "developed curriculum as well as trained other instructors in best practices for teaching." JA 2181; *See* JA2223-24 (Mayhugh Resume); JA 2226 (Staff Chart).

In evaluating whether PMTC, with Beatty and Mayhugh coupled with Juliet Mee and Jeremiah Mee, had adequate management, the Commission gave no consideration to PMTC's student outcomes and the extent to which PMTC, as of early 2012, was facing complaints from its students or employees, from employers of its graduates and/or from the DOE. JA 816-17. ACCSC's 2011 petition to the DOE for renewal of its DOE recognition stated that "mission fulfillment is seen to be the primary test of [an institution's] effectiveness." JA 1130-31. PMTC's mission was equipping students with a quality massage education so that they could work in the massage therapy industry and PMTC's student outcomes demonstrated it was accomplishing its mission. JA 1131.

### B. *Continuity of Management & Administration*

The ACCSC management standard also requires that "continuity of management and administrative capacity is ensured through the reasonable

retention of management and administrative staff." JA 4799, ACCSC Manual, Chap. 2, §I-A-4. The ACCSC manual does not define "reasonable retention," *see* JA 401, but former Commissioner Mollis testified that, in evaluating turnover, it is important to know whether or not positions that had been vacated have been filled or their functions have been covered by another employee.  JA 841-42. Dr. Kershenstein also testified that the primary concern with turnover in administrative and management positions is whether there are "systems in place" at the institution to ensure that essential functions are being carried out. JA 1138-40.  And Dr. McComis agreed that the focus here is "are administrators in place in all the positions to cover the needs of the students." JA 403 (Tr211)

The Denial Decision found that PMTC did not have reasonable retention of staff, because it had replaced its administrator several times in the past year and its school director once had terminated several administrative positions (marketing, facilities management, graduate services coordinator) without replacing them. JA 2378.[11]

In its probation response, PMTC pointed out, as did the District Court in its ruling, that owner Juliet Mee, who had been actively overseeing the school since founding it in 1994, provided management and administrative continuity for this small single discipline school. JA 2228. The response provided a narrative

---

[11] Sharpe testified that he did not know how much turnover was "too much" for a school the size of PMTC. JA 1366 (Sharpe Dep.)

statement and a personnel chart showing that all of the operational functions, for

this massage education school with a student body ranging between 80 to 100

students, were covered by the 24 employees employed as of January 2012 (4 of

which were contract instructors). JA 2178-80, 2189, 2205, 2207, 2225-26, 2228,

2232-36.  PMTC's narrative statement explained that Rebecca Cox (school

director) and April Durnell's (school administrator), positions added at the urging

of ACCSC,[12] had been terminated for performance and integrity issues[13] and that

all management responsibilities which had been allocated among Ms. Mee (owner

and CEO), Ms. Cox and Ms. Durnell had been divided among Ms. Mee, Ms.

Mayhugh and Mr. Beatty. PMTC's probation response also noted that, after these

changes, the school had an instructor to student ratio of 1 to 9 and a manager to

student ratio of 1 to 20. JA 2184. And PMTC's Probation Response also included a

new employee benefits plan that PMTC was implementing to improve employee

loyalty and retention. JA 2232-36.

---

[12] Juliet Mee testified that she felt pressured by ACCSC to add a top administrator
with a college degree, because she did not hold a college degree and had been told
by 2010 visit team leader Michael Ackerman that she was not qualified to run her
school. JA 615-16  (Tr 428-29).

[13] Dr. McComis testified that, if probationary employees do not work out or if an
institution finds it has to terminate employees for integrity issues like lying, and
those factors are explained in a school's response, "it is reasonable for the
Commission to take into account all the factors that are made available to it." JA
402.

With regard to the impact of turnover in some administrative and management positions at PMTC, Dr. Kershenstein agreed that, at the time the Commission made the Denial Decision in February 2012, there was no evidence of student complaints, employer complaints about the quality of PMTC's graduates, low student attendance rates, low student GPAs or classes not being held. JA 1141. In addition, the record before the Commission, reported "very good graduation and employment rates" and "high student satisfaction rates." JA 1141-42.[14]  The only impact cited in the Denial Decision was the Commission's conclusions that PMTC's LRS and its faculty background verification were not sufficient, JA 2379-83, conclusions that, as discussed below, do not have support in the record.

## C.    *Learning Resource System (LRS)*

The ACCSC learning resource system (LRS) standard states, in pertinent part, that an institution's LRS must "include materials commensurate with the level of education provided and appropriate to the courses of study in sufficient quantity and scope to meet the educational objectives of each program" and must be "managed by qualified school personnel with sufficient experience to provide oversight and supervision." JA 4805. Noting that PMTC's January 2012 Probation

---

[14] In contrast to PMTC's circumstances, an ACCSC Commission's "stealth exercise," in finding non-compliance with the continuity standard at a hypothetical school, emphasized that the longest tenure of any management employee was 15 months, the average tenure was 7.2 months and the student satisfaction level was 49%. JA 394-95 (McComis Depo.), 4466.

Response included a statement by PMTC that it was planning further improvements to its LRS, JA 2264, 2381, the Commission "questioned how PMTC ensures that its student body is adequately served and has ready access to sufficient and appropriate learning resource materials as PMTC indicated that its efforts were still under development." JA 2381.[15] The Commission's expressed concern about PMTC's plans to further improve its LRS was odd, given that a core premise of accreditation is "to encourage institutions to continually improve their operations," JA 877 (Tr570, Mollis), and that the Commission had asked PMTC to address its LRC in its Institutional Improvement and Assessment Plan (IAIP).[16]

In its December 2011 Probation Order, the Commission stated that PMTC "had satisfactorily addressed the on-site evaluation team's finding regarding LRS materials" and only asked PMTC to address its LRS supervisor and integration of the LRS into curriculum. JA 2162. And, in fact, the two binders PMTC gave to the 2011 visit team contained lists of the holdings in PMTC's campus library and the relevant holdings at the MSU library, JA 3573-3745, 3827-28, and PMTC's

---

[15] Mollis testified that the Commission decided on its own, without any input from any person with expertise in curriculum for a massage therapy program, that PMTC's materials were not sufficient. JA 822-23. And, as discussed below, *infra* at 30-31, the 2011 visit team did not include a massage education specialist, yet that team made a finding that PMTC's LRS was insufficient.

[16] PMTC's plans for improving its LRS were set forth in its IAIP, JA 2260-61, a planning document the Commission's 2011 Probation Order had asked PMTC to submit. JA 2160-61.

October 25, 2011 TSR response also contained lists of the holdings at PMTC's campus and the relevant holdings at MSU, along with information on PMTC's relationship with MSU, integration of PMTC's LRS into the curriculum, the institution's LRS policies, its IAIP plan for improving LRS and the institution's hiring of Greg Holman.  JA 1902, 2002-08, 2020, 2034, 2040-97.

The Decision stated that that PMTC was failing to meet the LRS standard because it had only a part-time LRS manager, Greg Holman, an assistant librarian with the Springfield, Missouri public library. JA 2380-81.[17]. Former Commissioner Mollis testified that the Commission felt Holman "was qualified" but their concern was that his part-time work was not sufficient to oversee PMTC's LRS. JA 820-21. PMTC's Response explained that, since PMTC students had MSU library staff available to assist with MSU resources (under PMTC's agreement with MSU) and PMTC's campus library was relatively small given its massage education focus, part-time supervision was more than adequate from an experienced librarian like Mr. Holman, who was "innovative and knowledgeable about the types of materials our [PMTC's] students would like to use for the enhancement of their education." JA 2264.[18]

_____

[17] Holman's resume and information about his responsibilities was included in PMTC's 2012 Probation Response. JA 2265-70.

[18] PMTC's 2011 TSR response, submitted in October 2011, also had pointed out that MSU library staff provided assistance to PMTC students in the use of MSU resources, JA 2002-08, and that PMTC believed the part-time services of Mr.

While the Commission thus was aware PMTC was a small single-discipline massage therapy school, it still decided that PMTC should have a full-time LRS manager. JA 823 (Tr 516 - Mollis). But the Decision does not provide any reasoned explanation for why the Commission rejected PMTC's judgment that an experienced part-time supervisor was sufficient for this small massage education only school.  ACCSC's own accreditation expert, Dr. Kershenstein, agreed that a part-time LRS manager was appropriate for a smaller school. JA 1147.

The Decision also stated that PMTC had failed to provide "documentation to demonstrate implementation of activities to improve the LRS that would benefit a student's education." JA 2381. But PMTC had included a discussion of specific LRS improvements in its 2011 TSR response, including the LRS chapter in its IAIP, its description of DVDs added to its campus holdings and its description of the planned addition of an online library through an organization known as ProQuest.  JA 2034, 2084, 2087-97. PMTC also addressed its LRS in its IAIP and the integration of its LRS into its curriculum in the Probation Response. JA 2260-61, 2271-98. Not noted in the Decision was the fact that PMTC students, in a survey taken during the 2011 evaluation visit, had given PMTC high marks on its LRS. JA 1894 (P.Ex. 139, 8-23-11 TSR, at p.17).

---

Holman were sufficient given PMTC's relatively small and massage focused library. JA 2086. But that information seems to have been ignored by the Commission.

Significantly, during the process of drafting the Denial Decision, Forman sent a March 1, 2012 email to Lambert pointing out that the LRS was not mentioned in the Panel D's institutional summary and offering the opinion that tying the LRS into a finding of inadequate management "is fairly weak." JA 2870 (3-1-12 Email). At Lambert's insistence, Forman kept an LRS finding in the Denial Decision and was commended by Lambert for doing so. JA 1030.

### D.    *Faculty Background Verification*

Regarding faculty verification, the relevant ACCSC standard states: "The school must **verify prior work experience** and maintain documentation of academic credentials of all faculty members and administrators, as required, to demonstrate compliance with applicable Standards of Accreditation." JA 4729, ACCSC Manual, Standard III-A-4. (emphasis added). The standard does not specify what kind of documents, if any, an institution must maintain concerning its verification of an employee's prior work experience. Mollis testified that verification could be a phone call to an employer, if "it is documented correctly," which could be through use of phone call record form. JA 886 (Tr579).

The Denial Decision stated that PMTC did not meet this standard, because its (1) verification policy stated that "background checks and reference checks **should** be done," JA 2300, and the Commission construed use of the word "should" in the policy as somehow indicating that these steps were not being taken,

and (2) PMTC was deemed to have inadequate records on the employment background of several instructors: Jason Back, Brittany Anderson, Melanie Elliott and Tracy Maxfield. JA 2382.

The Denial Decision said PMTC's use of the word "should" in its reference checks policy was an indication that PMTC was not actually performing such checks. PMTC's 2011 TSR Response, however, included a policy manual which, in Chapter 7 on Instructor File Development/Management, stated that staff "must verify resume credentials" and the "candidate must submit…[a] reference release form." JA 1999.

Regarding the four instructors whose records were deemed to not confirm three years or more of related experience, both PMTC's 2011 TSR Response and its 2012 Probation Response included information, statements and phone call reference check forms for all four individuals showing each had three or more years of related experience.  JA 2100, 2102-04, 2306-09, 2311-22, 2326-43, 2353-56. *Back* had worked as a chiropractor for 3 years and an instructor at another private college for at least 4 months. *Anderson* worked as a massage therapist for 3 years at Heart of Touch (her own business), 10 months at Elements Therapeutic, 2 years at the Art Studio and 6 months for a disabled individual. *Elliott* worked as a massage therapist at Zen3 for 2 years and for several years for a disabled client. *Maxfield*, who taught kinesiology, held a Masters degree from the University of

23

North Carolina in dance (a discipline that includes kinesiology), was a massage therapist for 2 years, had taught dance at Drury University for 5 years and had worked for over a year as a certified Pilates instructor for nearly 10 years in a program on treatment of injured patients.[19]

While writing the Commission's Denial Decision, Forman sent an email to Lambert, stating that he thought PMTC had provided adequate documentation of the three years of related experience for Back and Anderson and asking whether Lambert wanted him to keep them in the Decision. JA 2873 (3-6-12 Email). Lambert responded, "Yes I do," and added that this was part of the "management issue we are building around." *Id.* Lambert later commended Forman for "quite nicely" strengthening the faculty verification section in the Decision. JA 2867 (3-6-12 Email).

## X. Bias of Key ACCSC Managers

Lisa Miles, ACCSC's accreditation manager overseeing evaluation visits, JA 214-15 (Tr 51-52), participated in both evaluation visits to PMTC. JA 247 (Tr 57). She edited the 2010 TSR, JA 257-58 (Tr 67-68)[20] and wrote the 2011 TSR. JA 243,

---

[19] Notably, many of these employment verification materials also were in the two binders that Lisa Miles read and burned at her home. See JA 3844-3967.

[20] The 2010 TSR was written by ACCSC staffer Courtney Moraites and edited by Miles. While the leader of an evaluation team should review the TSR before it is issued, JA 252 (Tr 62), Miles could not recall if a draft of the TSR was sent to Michael Ackerman, leader of the 2010 evaluation team, JA 266 (Tr76) and

24

272 (Tr 53, 82). The Commission relied on the fact-finding expressed in the TSRs written and edited by Miles as findings of the team, JA 279 (Tr 89 - Miles), and the TSR was "very important to the [accreditation] process." JA 836 (Tr 529 - Mollis).[21] Miles thus played an elemental role in the two TSRs on PMTC that led to the 2010 and 2011 probation orders and ultimately to the Denial Decision.

Miles was not bashful in her disdain for Juliet Mee. JA 244-46 (Tr 54-56). She testified at trial that she spoke negatively about her perception of Juliet Mee's "behaviors" on an "occasional basis." JA 246. She and Chris Lambert, who became Associate Executive Director of ACCSC in late 2012, exchanged email messages in December 2011 about how "awful" it was to deal with Ms. Mee. JA 283-86 (Tr 93-96, Miles) 2822 (12-20-11 Emails). And, after Panel D voted on February 4, 2012 to not renew PMTC's accreditation, Lambert sent Miles, who had no involvement with the Panel and Commission proceedings concerning PMTC, JA 2824 (Tr102),  an email message with the subject "PMTC" and one word: "Revocation." JA 2824 (2-4-12 Email).

Lambert, who had been Panel D's Captain and oversaw Sean Forman's work in writing the summary for Panel D recommending PMTC's accreditation  be

---

Ackerman testified that he had no recollection of seeing the TSR. JA 1397-98 (Ackerman Dep.).
[21] Sharpe testified that the Commission relies upon the TSRs as findings of fact. JA 1354 (Sharpe Dep 96)

revoked and the Denial Decision, JA 1004 (Tr 826), also did not like Juliet Mee.[22]

Miles and Lambert, although not Commissioners themselves, sat in on the

Commission meetings to "facilitat[e] discussions." JA 243. Sean Forman testified

he had heard Lambert speak "negatively or in derogatory terms about Juliet Mee

and PMTC," and even more so after PMTC filed its lawsuit. JA 1047-48; 1016-

17.[23] Lambert, in giving guidance to Forman as he was drafting the Denial

Decision, insisted that Forman place information he knew to be false into the

decision, explaining this was "the management issue we are building around." JA

1022  (PEx67, Tr 844).

Lambert also added the footnote on page 1 of the Denial Decision, which

claimed that "management has been a longstanding issue at the school," JA 2374, a

statement that was misleading as demonstrated in Part E above, and his disdain for

PMTC was reflected in his flippant comment about this note, "Having said that, I

digress." JA 1025. And, after the drafting of the Denial Decision was complete,

Lambert proclaimed the letter to be "compelling" with "solid grounds for *our*

action," JA 2866  (3-6-12 email) (emphasis added), and he cruelly joked about

putting Forman's name on the Decision letter so that Forman would have to field

---

[22] Lambert had been listed on ACCSC's trial witness list, but ACCSC did not call
him to testify. Excerpts from his deposition were received in evidence.
[23] Juliet Mee testified that she felt that comments made between Lambert and Dr.
McComis at a December 21, 2011 meeting "were almost making fun of me." JA
625 (Tr438).

the phone calls from Juliet Mee. *Id.* Forman could not recall Lambert ever joking about other schools. JA 1031-32 (Tr. 853-54 - Forman)

Karen Marcinski, another member of senior ACCSC management, reviewed a draft of the ACCSC appeals panel denial letter, written by ACCSC's attorney, and dubbed it a "slam dunk." JA 2886 (7-11-12 Email).  Former Commissioner Kristi Mollis testified at trial that staff members celebrating about schools losing their accreditation would be inappropriate. JA 845.

Dr. McComis, Ms. Mollis and ACCSC expert witness Dr. Karen Kershenstein all agreed that bias by an ACCSC staff member against an institution is not appropriate. JA 408 (Tr 216 – McComis), JA 1133-34 (Tr  967 – Kershenstein), JA 843-44 (Tr 537-537). Dr. Kershenstein also acknowledged that, if an accrediting agency's decision is based on bias, that "would be inconsistent with the obligation to maintain consistency in the application of a standard." JA 1134 (Tr 967). And she further testified that it would not be right for ACCSC staff to build a case against an institution, JA 1156 (Tr 989), and that an "accrediting body needs to have controls in place to make sure that bias does not enter into its processes." JA 1134

While the Commissioners themselves might not have been biased, they rely entirely on a factual record developed by staff members and presented to them by staff members.  And yet, Allan Sharpe, the Chair of Panel D who recommended

27

PMTC's revocation based on what was presented to him by the staff, testified that it would make no difference to him to learn that certain staff members were biased against a school. JA 1353.

## XI.    ACCSC Process Irregularities

In addition to the palpable bias by the same staff members who were charged with conducting the fact-finding the Commissioners would then rely upon, the process was infected with errors and irregularities.  The 2010 and 2011 TSRs were written by ACCSC staff, rather than the Team Leader. Although a team leader is the most important member of a team, Miles could not recall whether a draft of the 2010 TSR had even been sent to 2010 team leader Michael Ackerman before it was officially issued, JA 266 (Tr76), and Ackerman also could not recall whether he saw the report. JA 1405.[24]  Miles also could not recall sending a copy of the 2011 TSR to team leader Molly Hager. JA 273.[25] Dr. Kershenstein testified that, if a biased agency staff member helped to write a TSR and that report was not reviewed by other team members, "[t]here is a possibility of bias" entering into the process. JA 1148 (Tr 981).

---

[24] Courtney Moraites, the other ACCSC staff member on the visit, recalled that she did not send a draft of the team report to Ackerman. JA 1077.

[25] Team leaders are responsible for overseeing an evaluation visit and its outcome. JA  4750, ACCSC Manual, Chap 1, Section III-D-3 ("The Team Leader is responsible for the completion of the on-site evaluation in accordance with the Commission's process and procedures and ensures that each team member performs the assigned functions.").

At the August, 2010 team site visit, Michael Ackerman, the team leader made rude comments to PMTC staff members and pressured the school to use more aggressive enrollment practices. JA 254-55. Juliet Mee complained to Lisa Miles. *Id.* And while the procedure was for Lisa Miles to report such a complaint back to the Commission, Lisa Miles never did. JA 257. Courtney Moraites, the other ACCSC staff member at the visit, testified that she was present when the complaint was raised about Ackerman, JA 1073-74. She testified she did not personally report the complaint back to ACCSC because she thought Miles would have and that it would be "shock[ing]" if Miles had failed to do that. JA 1075. She explained that this was especially out of the ordinary because "we are a close staff" and it would be "surpris[ing]" and abnormal for Miles to not report such information back to Dr. McComis or other senior management. JA 1078.

During the second 2011 evaluation visit, a rare Commission-directed visit to focus on PMTC's management, LRS, faculty verification and the IAIP, ACCSC did not send any team member with experience in massage therapy education. JA 263 (Tr 73). At this visit, PMTC provided Lisa Miles with two large binders of information to address the Commission's concerns. JA266-67. After the visit, Lisa Miles waited until two months after the visit to write the 2011 TSR, and it did not include all the information set out in the two PMTC binders Miles received during

the visit, or even reference that PMTC had provided the requested information in the binders. JA 271 (Tr 81).

ACCSC has no specific policy on what should be done with school documents given to an evaluation team on a Commission-directed visit, JA 279 (Tr89), but the Commission had directed PMTC to assemble the information, JA 274 (Miles)[26] and ACCSC rules state that the Commission will consider all relevant information when making an accreditation decision. JA 4777, ACCSC Manual, Chap. 1, Section VII-C-3 ("The Commission's decision relative to a school's application for accreditation (initial or renewal) will be based upon… information collected about the school.")

After completing the drafting of the 2011 TSR, Miles <u>burned</u> the contents of the two PMTC binders at her home and did not send a copy of them to ACCSC's offices. JA 274. Thus, no other team member was permitted to evaluate or consider the very information that the Commission directed PMTC to gather for the second site visit, nor was the Commission able to see the contents. Miles did not inform PMTC that she was burning the information in the binders and not passing the binders on to the Commission. *Id*; JA 614 (Tr 427, Mee). Former

---

[26] JA 4746, ACCCS Manual, Chap. 1, Section I-H ("The Commission may, at any stage in the accreditation process, request a school to produce documentation that it deems pertinent and relevant to an accreditation action.").

ACCSC commissioner Allan Sharpe testified that he thought the PMTC binders should have been provided to the Commission. JA 1359.

The 2010 evaluation team did not visit Missouri State University (MSU), with whom PMTC had a longstanding resource sharing agreement, to see if its holdings were adequate for PMTC's learning resource system (LRS). JA 260-61 (Tr70-71). The 2011 visit team also did not visit the MSU library, JA 264 (Tr 74).[27]

ACCSC staff had a practice of taking an institution's response and inserting their own comments into the .pdf document for the Commissioners to read, which sometimes include commentary about the extent of the school's compliance with standards. JA 288 (Tr 98). The Commission relies on these documents, with staff embedded remarks, as the record for making accreditation decisions. JA 411 (Tr 219, McComis).

ACCSC staff are not supposed to make any decisions as to what findings will be made against an institution and instead are supposed to use their notes from Panel and Commission meetings wherein the members expressed their opinions to write the decision of the Commission. JA 827-28 (Tr 520-21 - Mollis). Instead of following policy, ACCSC senior staff members Lambert and Forman debated on

---

[27] ACCSC's LRS standard recognizes that "materials that support a student's educational experience and enhance a school's educational program" include "library consortia and interlibrary loan agreements." JA 4805.

their own in email exchanges what fact-findings to include in Panel D's institutional summary on PMTC and in the Denial Decision. JA 1049.[28]  Mollis could not recall whether she or Panel D chair Sharpe had seen a draft of Panel D's institutional summary before it was presented to the Commission, JA 831, and Sharpe also could not recall whether he had seen it either.  The compliance summary on PMTC does not contain findings regarding the LRS or verification of faculty background, JA 832 (PEx 74, Tr 525 - Mollis), yet findings on those two areas appear in the Denial Decision, written by staff after the Commission meeting.

Neither Mollis nor Panel D Chair Sharpe saw a draft of the Denial Decision, prepared by staff, before it was issued. JA 834 (Mollis), JA 1361-62 (Sharpe).  The Commission's 2012 governance handbook, however, stated that, when a Panel recommends denial of accreditation, the Panel Chair should review a draft of the decision letter. JA 417 (Tr 225-26 – McComis), 3063 (PEx 153). The governance handbook also states that, when the Panel recommends adverse action, all of the Commissioner's notes are to be collected and given to staff to be held until the final disposition of the decision, *id.*, but Sharpe testified that the Panel members' notes were thrown away by staff. JA 1360 (Sharpe Dep at 108).

---

[28] Sharpe testified that, if the staff were uncertain as to what was discussed by the Commissioners, he would have expected the staff to contact him. JA 1344 (Sharpe).

**XII.    Damages PMTC Suffered After July 11, 2012**

When the Denial Decision was issued, despite the fact that PMTC timely pursued an administrative appeal under ACCSC rules, the DOE placed PMTC on HCM2 funding, or reimbursement funding that results in slower cash flow. JA 534 (Tr 347 Mee). And, when the appeals panel ruling was issued on July 11, 2012, affirming the Denial, PMTC automatically lost its eligibility to participate in the Title IV Programs as of that date. *See* 34 C.F.R. §§ 600.5 (a)(6) & 600.40 (a)(1). JA 4029 (PEx183). Predictably, loss of Title IV aid had a severe adverse impact on PMTC, as nearly 90% of its students were receiving some level of federal student aid. JA 533 (Tr 346, Mee).[29] Loss of accreditation, unless reversed, meant that PMTC, even if it later gained accreditation with another accrediting agency, would not be able to regain Title IV eligibility for two years from the date of loss of accreditation. 34 C.F.R. § 600.11 (c.).

As required under ACCSC rules, PMTC provided notice to its existing students that it had lost its ACCSC accreditation and that this development also resulted in loss of federal student aid. JA 557-59; 4902.

At the time of that decision, PMTC had 74 students enrolled and was planning to start a new cohort of students in August 2012, expected to number

---

[29] Dr. McComis acknowledged that the Commission , with PMTC's financial statements, were aware that over 70% of its tuition revenues came from the Title IV programs. JA 427-28  (Tr 235-36), JA 2960 (2011 financial statement)

around 20, but did not do so due to the loss of financial aid. JA 530-31 (Mee); 893-94(Jackson). As a matter of historical practice, PMTC had new "class starts" or new enrollments five times a year: January, March, June, August and October.  JA 530-31.  PMTC's loss of ACCSC accreditation meant that it no longer possessed this important qualification that had been mentioned on its website at the time its students had enrolled. JA 542 (Tr355, Mee). And PMTC's inability to offer federal student aid prevented its students from making payment of tuition charges with federal aid as outlined in PMTC enrollment agreements, JA 541-42 (Tr 354-55 Mee), 2901 (PEx106). But for the injunction, this would have placed PMTC in jeopardy of closing and not fulfilling its agreement to provide an entire program of massage education to its students. JA543-44 (Tr356-57).

After PMTC's accreditation was reinstated by ACCSC pursuant to the District Court's September 17, 2012 injunction, PMTC regained participation in the Title IV Programs in early October 2012. JA 534 (Tr 347 Mee). PMTC's October 2012 cohort of students was close to a normal level because it included some of the students who could not start in August 2012. JA 894 (Tr Jackson).  But PMTC's enrollments declined after that, with a lower level of "conversion" of prospective students into enrollments, and by the time of trial in July 2013 PMTC had only 54 students. JA 894-98 (Jackson).

Under the District Court's injunction order, and a subsequent clarifying order, PMTC was required to tell all existing and prospective students that its "accreditation is under review and may ultimately be revoked." JA 68. Since loss of accreditation would also mean loss of federal student aid, PMTC had an obligation under DOE regulations to inform students and prospects of that risk. *See* 34 C.F.R. §§ 668.42 and 668.73. PMTC's notices to its students and prospects addressed the risk of loss of accreditation and loss of federal aid and the existence of this lawsuit. JA 4903. PMTC's admissions officer, Kristen Jackson, testified that some prospective students who contacted PMTC about possible enrollment did not submit an enrollment application after being notified about the risk that PMTC could lose its accreditation and federal aid and it was her impression they were waiting on the outcome of the lawsuit JA 898-99 (Tr 594-95, Jackson).

PMTC's damages expert, Gary Trugman, examined PMTC's enrollments and financial performance during the time period after July 11, 2012 and also during a lengthy time period prior to that date. He reviewed enrollment and financial information beginning as far back as 1997 and going forward to the time of his initial report issued on February 10 , 2013, JA 4128 (PEx 204), and his supplemental report issued on April 9, 2013. JA 4080 (PEx202). He also reviewed and analyzed information on the general economic conditions during the same broad time period, information concerning the education industry in general and

information concerning the massage therapy education component of the education industry.

After running regression analyses on various factors, Trugman identified the strongest correlation to exist between the gross domestic product (GDP) and the level of PMTC's enrollments. Using that factor, he projected what enrollments at PMTC for a three year time period starting on July 11, 2012 and compared them to PMTC's actual enrollments after July 11, 2012. Based on the reputational impact of PMTC's loss of accreditation and the students notices it was required to give under the conditional accreditation it held under the injunction, Trugman concluded that it would take at least three years for PMTC to recover and regain the enrollment levels it would have had but for the ACCSC accreditation problems. JA 545-46.

Taking the difference in enrollments under the GDP projection and those PMTC actually had through the time of his reports, JA 4348 (PEx 289), Trugman, using a longstanding principle sometimes called step cost accounting, calculated lost profits by determining the level of enrollments that covered PMTC's fixed operating costs and then analyzing what variable costs would apply to enrollments above that level. JA 976 (Tr679). [30] Using this approach, Trugman calculated

---

[30] "When we do our analysis of lost profits, what we're looking at is we're looking at the incremental costs that related to an incremental dollar of revenue." JA 995 (Tr698); JA 4348 (PEx 289).

36

PMTC's lost profits over a three year period, discounted to present value, to be $1,267,405. JA 959-60 (Tr 662-63).[31] To the lost profits, he added the costs for PMTC to recruit and train staff to replace employees who resigned following the ACCSC accreditation problems and pre-litigation legal fees and costs incurred by PMTC in appealing the Denial Decision, which resulted in his conclusion that PMTC suffered damages totaling $1,408,656.  JA 4128; 4080 (PEx202).

ACCSC's damages expert, Harold Martin, testified to his analysis of PMTC's past profits, which assessed profits as a percentage for entire student populations, without accounting for an incremental cost analysis correlated to various levels of enrollment. JA 1220-21 (Tr 1055-56) Based on this analysis, the district concluded that PMTC's lost profits were only one-third of the amount calculated by Mr. Trugman. JA 18-19. Using this lower lost profits figure, the District Court determined PMTC's damages, resulting from the action of ACCSC in violating PMTC's due process, to be $429,016.62. JA 15.

---

[31] Trugman also conducted many other qualifying analyses, including considering variations in levels of operating expenses with varying levels of students and adjusting tuition revenue for PMTC's historical drop rate. JA 950-57 (Tr 653-60).

## SUMMARY OF THE ARGUMENT

The District Court properly concluded that ACCSC deprived PMTC of due process by not considering all relevant information, violating its own policies, and by allowing key ACCSC managers who held an openly expressed bias against Juliet Mee and PMTC to infect the decision making process of the Commission.

On March 7, 2012, after some two years of examining PMTC, ACCSC denied PMTC renewal of accreditation on the basis that it had not demonstrated adequacy of on-site management and continuity of administrative personnel. The Denial Decision also stated that lack of management resulted in PMTC failing to meet learning resource system (LRS) and faculty verification standards. The Denial Decision, however, did not address how PMTC's management could be judged inadequate while its graduation and placement rates were in the upper ranks of all ACCSC accredited schools and its recent student surveys had high approval ratings, nor did it address how the LSR was deficient when it included university library materials in addition to PMTC's onsite collection of materials and was supervised by an individual who was an assistant librarian with the Springfield, Missouri public library. The District Court found that ACCSC's failure to address these factors, coupled with other process irregularities and staff bias, evidenced a violation of PMTC's due process rights.

Moreover, the District Court determined that the record before the Commission did not support any of the specific findings made in the Denial Decision, including the conclusions that PMTC managers Jeremy Beatty and Linda Mayhugh did not meet PMTC's requirements; that PMTC lacked sufficient continuity in administrative and management positions; that PMTC's LRS lacked sufficient resources and management; and that PMTC failed to verify the background of some faculty members. Significantly, even an ACCSC's Sean Forman, who drafted Commission decision documents, openly doubted many of the findings being made.

In its opening brief on appeal and in proceedings before the District Court, ACCSC asserted other areas of alleged non-compliance, addressed in earlier Commission's orders and resolved by PMTC, which were not cited in the Denial Decision.  Dr. McComis, however, testified that the basis for the Commission's decision is what is set forth in the Denial Decision. He also agreed that the reaccreditation process – involving the issuance of team reports, school responses, Commission orders and further school responses – is a winnowing process and the only relevant issues are those remaining at the time the Commission takes action on an institution's accreditation application. Accordingly, the District Court properly did not consider these other areas in its review of the Denial Decision.

As the evidence outlined above establishes, the District Court correctly concluded that the Denial Decision was not supported by the record and was the product of a flawed process. The District Court, therefore, correctly found for PMTC on its claim for denial of due process (Count I), both procedurally and substantively.

While finding for PMTC on its due process claim, the District Court ruled against PMTC on its contract claim (Count II), based on the court's mistaken belief that Virginia law does not impose a duty of good faith and fair dealing in all contracts. Former ACCSC Commissioner Kristi Mollis, however, testified that ACCSC had an obligation to act in good faith and fairly apply its standards, and the District Court found that ACCSC had allowed bias against Ms. Mee to adversely affect the Commission's application of its standards to PMTC. The evidence thus established a breach of ACCSC's duty of good faith and fair dealing, which the District Court should have found.

The District Court also ruled against PMTC on its tortious interference claims (Counts III-VI) on the premise that PMTC did not show the required element of lack of justification, because, as a general matter, ACCSC has a right to rescind accreditation whenever it concludes that an institution has failed to comply with ACCSC standards. But this ignores the court's fact-finding that ACCSC allowed biased staff to advocate for PMTC to lose its accreditation, for which there

is no possible justification. Thus, the court also should have found for PMTC on its tortious interference claims and also should have considered whether an award of punitive damages is warranted here.

Finally, while the District Court found that ACCSC's denial of due process directly resulted in harm to PMTC's operations, the court did not award the $1,408,656 of damages to which PMTC's expert Gary Trugman opined; instead the court awarded reduced damages of $429,016.62. The court rejected the expert's damages calculation on the basis that it represented a profit percentage not supported by PMTC's historical profit percentage, but this reasoning ignored step cost accounting and the evidence that PMTC's fixed costs were satisfied from tuition paid by enrollment level and that a majority of the tuition paid by students above that level represented profit lost by PMTC. Since the District Court's lesser damages award was based solely on its misapprehension of step cost accounting, the court's award of $429,016.62 should be vacated and the court should be directed to enter an award of actual damages in the amount of $1,408,656, or, alternatively the case should be remanded to the District Court with instructions for it to review the evidence on damages and to make an award of damages based on an application of step cost accounting methodology.

# ARGUMENT

## I.    Standard of Review on Appeal

PMTC seeks affirmance of the District Court's ruling on Count I of PMTC's Complaint, reversal of the District Court's rulings on Counts II through VI of the Complaint, and recalculation of damages based on clear error by the District Court. Because the District Court made its ruling following a trial to the court and post-trial briefing by the parties, this Court may set aside its findings of fact only if they are clearly erroneous. Fed. R. Civ. P. 52(a). The Court reviews the district court's conclusions of law *de novo*." *Resolution Trust Corp. v. Maplewood Invs.,* 31 F.3d 1276, 1281 n. 7 (4th Cir. 1994).

## II.    The District Court Applied the Correct Standard for Review in Finding ACCSC Denied PMTC Due Process, and the District Court's Ruling is Supported by the Record before the Commission and the Evidence at Trial Concerning ACCSC's Actions in the Accreditation Process.

### A. When Actual Bias is Demonstrated, Even "Great Deference" Cannot Resuscitate an Erroneous Accreditation Decision.

This case appears to be the first of its kind, as apparently no federal court has previously found actual bias against a school by an accrediting agency. Thus, while there are positive and negative cases on the degree of deference owed to accreditors, all must be read with this one extreme caveat. No matter what degree of "process" is due, no court has previously held that an accreditor's decision can

survive a finding that its process was biased against the member school. The Court is thus left in the unique position of drawing this line in the sand for the first time.

In the past, most courts have recognized schools have at least a "common law" right to due process in seeking accreditation. *Fine Mortuary Coll., LLC v. Am. Bd. of Funeral Serv. Educ., Inc.*, 473 F. Supp. 2d 153, 157 (D. Mass. 2006); *Thomas M. Cooley Law Sch. v. ABA*, 459 F.3d 705, 712 (6th Cir. Mich. 2006); *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colleges*, 44 F.3d 447, 449 (7th Cir. 1994)*; Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 33 (1st Cir. 1998) (recognizing federal jurisdiction exists over accreditation challenges in context of removal from state court); *Cf. Hiwassee Coll., Inc. v. S. Ass'n Of Colleges And Sch.*, 531 F.3d 1333, 1335 (11th Cir. 2008) (assuming "[w]ithout deciding" whether accrediting agencies "have a common law duty to employ fair procedures when making decisions affecting their members.").

This right "derives from early common law relating to private, voluntary organizations," which had recognized that courts may need to intervene if an "accrediting association's decision to rescind a school's accreditation" was "arrived at arbitrarily and without sufficient evidence to support [it]." *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 527-28 (6th Cir. 2001).  These early cases recognized that because accrediting agencies

exercised a "monopolistic power in areas of public concern, they were required to base their decisions on substantial evidence and were not allowed to act arbitrarily or unreasonably." *Id.* And "where membership in an organization is a significant requirement to practice in a given profession," courts were more willing to "scrutinize the standards and procedures used by the organization to select its membership." *Id*. p. 527-528.

In subsequent cases reviewing school accreditation decisions, courts have held that such decisions are accorded "great deference," limiting review to whether the decisions were "arbitrary and unreasonable' and whether they were supported by 'substantial evidence." *Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Sch*., 957 F.2d 210, 214 (5th Cir. 1992). But in the words of Judge Posner, "deference is earned; it is not a birthright." *Kadia v. Gonzales, 501 F.3d 817*, 821 (7th Cir.2007). Instead, the "extent to which deference is due to the professional judgment of the association will vary both with the subject matter at issue and with the degree of harm resulting from the association's action." *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*, 432 F.2d 650, 655-56 (D.C. Cir. 1970).

In July, 1992, following the decision in *Wilfred Acad.*, Congress broadened the rights of schools to seek review in federal court by creating a statutory cause of action, providing that federal courts have exclusive jurisdiction over suits brought

by schools challenging accreditation decisions made by certain organizations approved by the Secretary of Education. Higher Education Amendments of 1992, PL 102-325, July 23, 1992, 106 Stat 448, codified at 20 U.S.C. § 1099b(f); *See Escuela de Medicina San Juan Bautista, Inc. v. Liaison Comm. on Med. Educ.*, 820 F. Supp. 2d 317, 319 (D.P.R. 2011) (recognizing 20 U.S.C. § 1099b(f) as the source of a school's right to due process in the accreditation process).

At a minimum, a school's right to due process in accreditation requires a "fair and impartial procedure" and for the accreditor to "follow[] its rules in reaching its decision." *Auburn Univ. v. S. Ass'n of Colleges & Sch., Inc.*, 489 F. Supp. 2d 1362, 1370 (N.D. Ga. 2002). The process must be free of bias. *Fine Mortuary Coll., LLC*, 473 F. Supp. 2d at 159 (A"[d]ecision by an impartial tribunal is a fundamental element of due process under any standard," and "[i]f proven, such bias would be troubling"). Due process requires the accreditor to "conform its actions to fundamental principles of fairness." *Med. Inst. of Minnesota v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987); *See also W. State Univ. of S. California v. Am. Bar Ass'n*, 301 F. Supp. 2d 1129, 1137 (C.D. Cal. 2004) ("The question is not whether [the school] has had some opportunity to be heard, but whether [the school] has had a fair and effective opportunity to be heard.").

But far less than actual bias is sufficient to demonstrate a lack of due process. For example, one court has recognized a violation of the right to due process when the accreditor used "fluid definition[s]" of terms in their standard, giving rise to the mere possibility of impartiality. *W. State Univ. of S. California v. Am. Bar Ass'n*, 301 F. Supp. 2d 1129, 1136-37 (C.D. Cal. 2004). Even the potential for conflicts of interest may be sufficient to establish a due process violation. *Escuela de Medicina San Juan Bautista, Inc.*, 820 F. Supp. 2d at 319 (potential for conflict of interest was sufficient to demonstrate due process violation.). *Cf. Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc.*, 556 F.2d 78, 82 (1st Cir. 1977) (holding that while the mere "appearance of impropriety" might not be a due process violation, actual bias will always violate due process).

This is not a close case. The trial court here found far more than the mere "potential" for bias, and PMTC is aware of no case where any prior court has found actual bias on the part of an accreditor. *See e.g. Med. Inst. of Minnesota v. Nat'l Ass'n of Trade & Technical Sch.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (declining to reverse because there was "no evidence that the appeals panel was biased."); *Marlboro Corp. v. Ass'n of Indep. Colleges & Sch., Inc.*, 556 F.2d 78, 82 (1st Cir. 1977) (school made "no showing that the decision was in fact tainted by bias."). Thus, if the Court finds that the District Court's fact-finding on bias was not "clearly erroneous," this case is in a class all by itself. It was far from

46

controversial for the District Court to hold that the existence of actual bias in the record was a violation of due process. ACCSC offers no compelling reason, and PMTC is aware of none, that this conclusion should be disturbed on appeal.

ACCSC treats the issues of bias and whether the Commission's decision was supported by "substantial evidence" as separate and distinct in its briefing. *Compare* ACCSC Br. p. 36 and p. 53. But these issues are necessarily one and the same, because the District Court held that "[d]eeply negative staff bias against Ms. Mee" had "completely infected the record that the commission reviewed." JA 14. Because of this deep and pervasive bias on the part of the people who actually created the factual record, conducted the ACCSC fact-finding, and made choices to craft the record in a way to prejudice PMTC, the District Court did not err in holding that the record was not supported by "substantial evidence."

ACCSC would have this Court review the Commission's underlying decision in the first instance for "substantial evidence". ACCSC Br. p. 36. But appellate courts do not work in a vacuum, and findings of fact by a trial court are reviewed for "clear error," not "substantial evidence." Thus, the question for the Court is not whether the Commission's decision was supported by "substantial evidence" as ACCSC says but whether the District Court's fact-findings about the record are "clearly erroneous." So long as the District Court's finding that biased staff members intentionally manipulated the record to persuade the Commissioners

to revoke PMTC's accreditation out of personal animus, the Commission's decision cannot be supported by "substantial evidence."

Either way, ACCSC is also wrong on the merits of its "substantial evidence" argument because as outlined at length above, PMTC submitted overwhelming evidence to demonstrate its ongoing compliance with ACCSC's standards.

### B. Regulatory Changes in 2010 Reduced the Degree of Deference Owed to Accreditation Decisions, and the Cases That Precede That Change Are Not Binding.

If anything, the "great deference" standard the District Court used was *too* deferential, given the recent statutory and regulatory changes, culminating in the DOE's issuance of regulations in 2010 which substantially broadened the review of accreditation decisions under federal law. ACCSC cites to cases about deference dating back to the 1960s without even *mentioning* this sea change which necessarily upended the "great deference" standard courts had traditionally employed. ACCSC Br. p. 31-34.

Prior to the reauthorization of the Higher Education Act in 2008, the statute already required "due process," including the right to an appeal hearing, but it did *not* require accreditation appeal panels to have the power to actually reverse a negative decision. Thus, a school could literally win its administrative appeal but the accreditation agency, a private corporation with little meaningful oversight, could still revoke the school's accreditation and thus its access to Federal Title IV

funding. Under this prior version of the statute and regulations, unfettered deference was left in the hands of the accrediting agency. And Federal courts understandably followed suit, limiting their own power to review accreditation decisions, as reflected in the cases ACCSC cites.

But in 2008 Congress amended the Higher Education Act and fundamentally changed the accreditation appeal process (and, by extension, the way federal courts are to review accreditation cases). In particular, in amending 20 U.S.C. § 1099b(a)(6) Congress explicitly addressed issues of conflicts of interest, notification and hearing provisions, and expanded the rights of institutions to appeal an accreditation decision.

Two years later, when the regulations implementing these changes became final, the real teeth to this new pro-review paradigm were added. With these new regulations, which became effective on July 1, 2010, the Secretary of Education required that an independent appellate panel be allowed to *reverse* the accreditor's decisions, mandating schools have the right to appeal "to an appeals panel that

> (i) May not include current members of the agency's decision-making body that took the initial adverse action;
> (ii) Is subject to a conflict of interest policy;
> (iii) Does not serve only an advisory or procedural role, and has and uses the authority to make the following decisions: to affirm, amend, or reverse adverse actions of the original decision-making body; and
> (iv) Affirms, amends, *reverses*, or remands the adverse action."

34 C.F.R. § 602.25(f) (effective July 1, 2010) (emphases added). Thus, no longer was an accreditor's decision subject to unfettered discretion. This regulation for the first time required the revocation of accreditation to be subject to review by neutral individuals, who were empowered to say that the accreditor had gotten it wrong, and that the school should have been accredited, eliminating the "deference" implied by the prior statutory scheme.

In response to questions raised during the "Notice and Comment" process regarding 34 C.F.R. 602.25(f), the Secretary of Education explained at length why the power to *reverse* an accreditor's decisions was a necessary change:

> "The Department is concerned that without making additional changes, the regulations would be ambiguous and subject to an interpretation that would allow agencies to write their procedures to provide that their *appeals panels are authorized only to affirm a decision or order a remand*. This reading would not be consistent with Congressional intent, as the appeal would then be simply an additional procedural step involving a body that has *no ultimate authority to effect a change in the accrediting decision*. Therefore, the language in the proposed regulations has been changed to specify that an appeals panel has and uses the authority to affirm, amend, or reverse adverse actions of the original decision-making body, and does not serve only an advisory or procedural role."

Institutional Eligibility Under the Higher Education Act of 1965, as Amended, and the Secretary's Recognition of Accrediting Agencies," 74 Fed. Reg. 55414-01, 55417 (emphases added). The Secretary said the requirement that independent appeals panels be empowered to completely reverse the commissioners' decisions "reflects a straightforward reading of Congress's directives to agencies to provide

for appeals in front of a different decision-maker." *Id*. And he noted that the appeals panel must be able to "address <u>substantive matters</u>, as necessary, not just matters relating to process." *Id*. p. 55417-18.

These statutory and regulatory changes necessarily changed the degree of deference federal courts owe to accrediting decisions, because the decision a federal court is reviewing is the decision by the appeals panel whether to reverse, remand, or affirm the decision.[32] It would make no sense for Congress to suddenly require accreditors to subject their decisions to independent appellate review by non-accreditors empowered to completely reverse their decisions, and yet not also understand that a federal court reviewing the appellate panel's decision could do the same. If the appellate panel under the 2010 regulations has the power to reverse the accreditor's decisions, then a federal judge reviewing the appellate panel's decision, as here, necessarily has the power to hold that the appellate panel *should have* reversed, just as the trial court did here.

### C. The District Court's Findings of "Ampl[e]" Bias and Arbitrary Adjudication Were Far From Erroneous.

---

[32] Numerous cases ACCSC relies upon border on useless because they rely on old versions of the Higher Education Act. As the court observed in *Escuela de Medicina San Juan Bautista* cases "decided prior to the enactment of the 2008 amendments to § 1099b" are "of little value" because they precede the broadening of due process requirements under the statute. *Escuela de Medicina San Juan Bautista, Inc*., 820 F. Supp. 2d at 319 (D.P.R. 2011) (rejecting *Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs., Inc.,* 490 F.Supp.2d 1348 (N.D.Ga. 2007) as abrogated by statute).

51

Although ACCSC challenges the bias finding as "clearly erroneous," it spends just a <u>single</u> sentence in its brief on the topic. ACCSC Br. p. 53. This is a significant omission, because by failing to offer any legal or factual support for this single sentence in its brief, ACCSC has, in essence, waived the issue of whether the bias fact-finding is clearly erroneous. *See Sales v. Grant*, 224 F.3d 293, 296 (4th Cir. 2000) (finding that by offering just a "single, cursory sentence on the matter," the defendants had "waived their right to press seriously their claim."). Thus, on appeal, there is no meaningful dispute that the findings by the trial court of actual bias were not "clearly erroneous."

Even if ACCSC had not waived its challenge to the bias fact-finding, it is most certainly not "clearly erroneous." Findings of bias and discrimination are findings of fact, subject to "clear error" review. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985). This standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.* That is especially true with respect to "the findings of a district court sitting without a jury." *Id.* If the district court's account of the evidence is plausible in light of the record viewed in its entirety, "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* p. 573-74. And "[w]here there are two

52

permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id*. p. 574.

Here, the District Court had the ability to listen to and weigh the credibility of the witnesses, including several individuals involved in the pattern of bias against PMTC. There was ample evidentiary support, as outlined above, for the finding that a biased employee, Lisa Miles, was in charge of creating the Team Summary Reports that the Commissioners then relied upon as findings of fact. Both Kristi Mollis and Allan Sharpe testified that the Commissioners relied on these reports as findings of fact in making their conclusions, and Allan Sharpe testified it would not matter to him to find out that the staff member writing the report was biased. In addition to writing up the "team" reports, Miles chose not to give the Commissioners two binders of documents PMTC had provided her at the Commissioners' request, instead choosing to burn them at her home. And she chose not to visit part of PMTC's LRS, located on the Missouri State University campus, as part of her fact-finding on whether PMTC's LRS was adequate.

There is ample evidentiary support for the idea that Miles and Christopher Lambert were in the Commissioners' meetings "facilitating" discussions and that staff members embedded comments about the school into the electronic copy of the documents given to the Commissioners. Elsewhere, Miles and Lambert voiced their disdain for PMTC and for Juliet Mee. And the e-mail messages and draft

documents are in the record, showing Lambert telling his underling, Sean Forman, to include statements he knew to be false about PMTC and Juliet Mee in a compliance summary and in the final decision.  The record demonstrates these staff members celebrated when PMTC lost its accreditation and made cruel jokes about who would have to talk to Juliet Mee on the telephone when she received the decision saying the school she had built had lost its lifeline to Title IV funds on the whim of these biased employees.

The bias found by the District Court prevented the Commissioners from seeing the entire record, and the District Court was correct in finding that the Commissioners' votes themselves carried little weight given that staff had so infected the record with their own bias.  Allan Sharpe testified he thought the two binders Lisa Miles burned should have been shown to him, and he was the Commissioner that actually recommended revocation.

In addition to actual bias, the District Court's findings that the adjudication was "arbitrary" is a factual finding that is not "clearly erroneous."  The court observed that ACCSC had "deem[ed] the LRS inadequate without having examined it," which it held was "arbitrary by definition."  That finding is well-supported in the record.

The court also made a factual finding that PMTC's flexible interpretation of its *own* experience requirements, when ACCSC didn't even have experience

requirements, did not justify revoking its accreditation. JA 10. This factual finding does not "substitute" the court's judgment for the accreditor, because the District Court observed that ACCSC didn't even have independent experience requirements for it to interpret and that "[i]f ACCSC had independent experience requirements for certain positions, then revocation might be proper." JA 10. Instead, the court correctly concluded that ACCSC was arbitrarily applying its standards because it had no standard on the subject to apply. *Id.*

### D. When the Staff Bias is Removed From the Process, PMTC is Quite Plainly a Well-Run School With Excellent Student Outcomes.

ACCSC offers no meaningful challenge to the factual question of bias, and when that gloss is removed, the record before the court amply supported the finding that this was a very good school, with excellent student outcomes, and a long history of success. Far from these findings being "clearly erroneous," ACCSC offers little in its brief to support a finding that PMTC did not deserve accreditation, other than the fact-finding the trial court found to be biased. Contrary to ACCSC's argument on appeal, the record contains more than enough support for the District Court's conclusion that PMTC was eligible for accreditation under ACCSC's standard and thus that, in effect, the ACCSC appellate panel should have reversed the denial decision.

The two central reasons ACCSC chose for denying PMTC's accreditation were a purported lack of "administrative capacity" and "administrative continuity." But the District Court correctly found that contrary to ACCSC's finding that PMTC's leadership was inexperienced, PMTC had had the same leadership for years, and had previously gotten accreditation from ACCSC with that leadership in place. And the District Court found that the continuity issues ACCSC cited were in fact caused by ACCSC demanding that PMTC change around management employees to satisfy ACCSC, rather than to meet the school's obligations to its students.

The only other shortcomings cited by ACCSC were found to be factually inaccurate by the District Court. It noted that Allan Sharpe had testified the main topic of discussion at the Commission meeting was the school's LRS. J A5. That finding is supported by Sharpe's deposition testimony. JA 1370. The trial court relied on this credible testimony to find that the LRS was the Commissioners' central concern, rather than the list of other issues Chris Lambert and Sean Forman added to the decision letters without the Commissioners' insight. And while District Court explicitly declined to "substitute its own judgment for that of the expert commission on this point," JA 9, there wasn't much "judgment" by the Commission to substitute. Allan Sharpe testified he couldn't recall any discussion at all about whether the Missouri State University library was adequate. JA 1371.

Indeed, it is far from controversial to conclude that a public University's library, which it shares with PMTC, is more than adequate, especially given its extensive holdings related to massage therapy. ACCSC never pointed to anything in its revocation decision, at trial, or in its brief in this court that would even begin to explain why the MSU library was purportedly inadequate. Thus, the District Court's reversal of the LRS findings were not clearly erroneous.

Finally, the District Court correctly noted that ACCSC had waived any argument that PMTC had failed "to verify the work history and experience of its faculty and staff." JA 10. And the only other basis for revoking PMTC's accreditation, after granting PMTC accreditation twice before, were ACCSC's unsupported belief that Juliet Mee was an inadequate manager. Thus, given that the Commission's decision was not supported by the record and, in fact, the record showed that PMTC was a good school, which had been accredited twice before, and continued to graduate its students and place them into jobs, the District Court's fact finding that PMTC established eligibility under ACCSC's standards to be accredited was not clearly erroneous.

III.     **The District Court Undervalued the Damages Award By Failing to Distinguish Between Fixed and Variable Costs, and the Court Should Have Awarded $1,408,656 in Lost Profits.**

In calculating damages, the District Court erroneously incorporated PMTC's "fixed costs" into its lost profits, which undervalued the lost profits amount by

over $900,000.00.  It is a well-settled rule that "variable expenses, not fixed expenses, should be deducted from estimated lost revenues in the calculation of lost profits damages." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 56 (Mo. 2005).[33] Fixed expenses are "the continuous expenses of the business that are incurred regardless of the loss of a portion of the business, for example rent, taxes, and administrative salaries." *Id*. p. 55.  Variable expenses, in comparison are "costs directly linked to the volume of business. *Id.*; H. Kent Munson, *Fixed Overhead Expenses: Gremlins of Lost Profits Damages,* 56 J. Mo. B. 104 (March–April 2000).

Plaintiff's damages expert, Gary Trugman, testified that his lost profits projection of **$1,408,656** accounted for PMTC's variable, fixed and incremental costs, explaining that "it's important that we only pick up those costs that would be avoided as opposed to the layer of costs that are necessary for the school to operate whether you have one student or ten students." JA 956. He explained why accounting for fixed costs was so crucial to determining actual lost profits:

> "If we have a school that has one student, and if the tuition is $100, and the cost is $99, the school would have a $1 profit. If you now

---

[33] The District Court based its damages analysis on Missouri law. JA 17.  But this result would be the same if based on Virginia law. *See JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 245 F. Supp. 2d 749, 751 (E.D. Va. 2002) ("Legal authority dictates that only variable costs, and not fixed costs, are to be deducted from gross revenues to calculate profits.").

> have a second student introduced at $100 of revenue and there are no
> additional costs involved, you now have a school that has $101 of
> profit.  It is like a software company. They put all this money into
> developing a product, and then every single incremental piece that
> they sell is almost pure profit. So, there is going to be much more
> profit on an incremental basis as you calculate profits in this instance
> than looking at the overall cost when you're looking at a fixed cost
> structure of all the instructors and the student base and the rent and
> everything that has to be covered whether you have one student or you
> have 100 students."

JA679.  Applied to this scenario, if PMTC started with 50 students and added 50

more, the amount of "profit" PMTC would realize from second set of students

would be far higher than the profit it realized from the first 50 students, whose

tuition went to cover PMTC's fixed costs.

In assessing lost profits, the District Court arbitrarily selected a "proper

projected rate of profit [as] 4.7%" without discussing how the addition of extra

students after PMTC has already paid its fixed costs would affect PMTC's future

profits.  JA 18. In essence, the court explained that it had split the proverbial baby,

deciding that because PMTC's expert suggested the profit rate on the *added*

students would be 90% and ACCSC's expert suggested the historical profit rate

was 3%, the courts selected rate of 4.7% was reasonable. JA 10-11, Fn. 8.

This analysis missed the crucial distinction between the two numbers

offered.  Trugman's suggestion that the profit on the *added* students would be

close to 90% explicitly took into account that PMTC would not have to re-pay its

fixed costs for these students, and thus that its per-unit profit on the students it

59

added would be far higher than its historical profit margin (because its fixed costs were already covered). Martin's testimony that 3% was the historical profit margin was inapposite, because it failed to take into account that PMTC's fixed costs would already be covered when it added the students the Trugman projection estimated would be added, and thus that the profit margin for *those* students would necessarily be higher.

Most importantly, the District Court's analysis, adopting a historical perspective at the suggestion of ACCSC's expert without accounting for the fixed costs PMTC had already paid, was contrary to the well-settled law that "variable expenses, not fixed expenses, should be deducted from estimated lost revenues in the calculation of lost profits damages." *Ameristar Jet Charter, Inc.*, 155 S.W.3d 56. Had the District Court removed the fixed costs from the future students it concluded PMTC would add in the next three years, the profit margin for those added students would be closer to the 90% Mr. Trugman testified to, because PMTC's fixed costs would already be covered and thus the added student tuition would be nearly all profit.

If the Court is inclined to agree with ACCSC that a discount rate should have been applied, the Court can adopt the damages projection of Gary Trugman, which included a reasonable discount rate of 11.4%. JA 960. ACCSC does not argue that Trugman's proposed discount rate was unreasonable, and it has thus

waived this issue. ACCSC Br. p. 60. Trugman's uncontested trial testimony was that 11.4% was a reasonable rate and that if Martin had avoided double counting and other manipulation of his discount rate, they would have reached nearly the same number. JA 964. Because correcting the District Court's errors in reducing the damages amount would lead to the same result Gary Trugman forecast in his trial testimony, the Court can adopt his damages analysis, including his discount rate, without remanding to the District Court to do so.

## IV.     The District Court Should Have Found That ACCSC Had An Implied Duty of Good Faith and Fair Dealing Under Virginia Law And That it Breached That Duty By its Due Process Violations

The District Court's dismissal of PMTC's breach of contract claim was based on a significant legal error by the court. To reach its conclusion that there was no breach of contract, the District Court held that "Virginia law … does not recognize" an "implied covenant of good faith and fair dealing." JA 15. This conclusion was false.

As this Court has held, in Virginia every contract contains an implied covenant of good faith and fair dealing. *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541–42 (4th Cir.1998); *See Penn. Life Ins. Co. v. Bumbrey*, 665 F.Supp. 1190, 1195 (E.D.Va.1987). "[A]lthough the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested

61

solely in that party." *Va. Vermiculite*, 156 F.3d at 542 (citations omitted); *Enomoto v. Space Adventures, Ltd*., 624 F. Supp. 2d 443, 450 (E.D. Va. 2009). Thus, because actual bad faith was found by the trial court in this case, it was plain legal error for the court to hold, nevertheless, that the agreement between PMTC and ACCSC did not include an implied covenant of good faith and fair dealing.

In the accreditation context, the Eastern District of Virginia has explicitly found a breach of contract when an accreditor fails to comply with its own accreditation standards. *See Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc*., 2009 U.S. Dist. LEXIS 23651 (E.D. Va. Mar. 18, 2009).[34] The District Court here distinguished *Career Care* based on its mistaken belief that Virginia law does not require a covenant of good faith and fair dealing, while California law does. JA 15, Fn. 5.

---

[34] One court has held that an accreditor's standards did not amount to a contract, but that case is distinguishable. *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colleges*, 44 F.3d 447, 449 (7th Cir. 1994). First, that decision was based on a conclusion by Judge Easterbrook that accreditation decisions should *never* be decided based on state law, solely because the federal courts have jurisdiction to hear them. *Id*. But beyond merely saying so, Judge Easterbrook gave little explanation for *why* federal courts could not apply state contract law. Second, there is specific testimony on the record here that there was an agreement between PMTC and ACCSC, that both had agreed to certain obligations to each other, and that ACCSC had agreed to treat PMTC fairly. Thus, on the facts of this case, there is little reason for this Court to adopt the now-20-year-old Seventh Circuit decision in *Chicago Sch. of Automatic Transmissions, Inc.*

At trial, several witnesses testified that ACCSC was required under its Standards to treat PMTC fairly. Even ACCSC's own accreditation expert testified that a duty of fairness was implied in the accreditation arrangement. Also, ACCSC's agreement with its insurance carrier describes its relationships with its member schools contractually. JA 4033 (agreeing that ACCSC has "written agreements with its clients."). And the *Career Care* case fully supports this conclusion. Thus, because of the District Court's mistake of law, the Court should remand for the District Court to retry the breach of contract claim.

Given the existence of a duty of good faith and fair dealing, it is plain from this record that ACCSC violated its duty. Just the findings of bias by the staff members alone demonstrate that ACCSC as an entity was not evaluating PMTC under their contract in good faith.

**V.      The District Court Should Have Found that Missouri Tortious Interference Law Does Not Support a Finding of Justification for Improper Action Taken By An Accrediting Body Due to Bias**

The District Court also erred when it ruled against PMTC on its tortious interference claims (Counts III-VI) without addressing well-settled Missouri case law on "improper means." The District Court held that PMTC did not show the required element of lack of justification, such that ACCSC "under certain circumstances" had the right to revoke PMTC's accreditation. JA 16. But this summary of the law was far from adequate.

Under Missouri law, there can be no "justification" if the actor used "improper means." *Baldwin Properties, Inc. v. Sharp*, 949 S.W.2d 952, 957 (Mo. Ct. App. 1997). PMTC raised this argument in its trial argument, pointing to "ample evidence" in the record of "improper means" by ACCSC. JA 158. But the trial court completely overlooked this legal issue. By doing so, the court committed legal error in rejecting the tortious interference claims.

Here, the Court found that ACCSC allowed biased staff to influence the Commissioners "to vote to withdraw PMTC's accreditation," JA 13, and to guide the fact-finding by burning PMTC's documents, refusing to visit its library, and overall writing the factual summaries from a biased perspective. In other words, improper means were used when ACCSC exercised its right to rescind PMTC's accreditation. Thus, the court also should have found for PMTC on its tortious interference claims and also should have considered whether an award of punitive damages is warranted here.

And, in reversing the District Court's decision on the tort claims, based on the court's legal error, the Court should also instruct the District Court to determine whether punitive damages are warranted for the tortious interference claims. To make a submissible case for punitive damages, "the plaintiff must present substantial evidence establishing that the defendant's conduct was 'outrageous because of [the] defendant's evil motive or reckless indifference to the

rights of others.'" *Cohen v. Express Fin. Servs., Inc.*, 145 S.W.3d 857, 865-66

(Mo. Ct. App. 2004).

## CONCLUSION

The District Court's finding that there was "ample evidence" of the improper

bias by ACCSC staff, who "openly ridiculed" Juliet Mee and drafted reports "in a

negative light to cause the commissioners to vote to withdraw PMTC's

accreditation," JA 13, is indeed supported by extensive evidence in the trial record,

as outlined in great detail earlier in this brief. That unchecked bias, coupled with

many occurrences of ACCSC staff and commissioners not complying with

ACCSC's process rules, resulted in ACCSC improperly revoking PMTC's

accreditation, denying PMTC due process, violating ACCSC's contractual

obligation of good faith and fair dealing and tortiously interfering with PMTC's

contracts and prospective relationships with its students, prospective students and

the United States Department of Education. The evidence at trial also conclusively

established, as the District Court found, that the record before the Commission did

not contain any support for the Commission's management capability and

continuity, LRS and faculty verification findings.

The record and controlling case law thus fully support the District Court's

ruling on Count I of the PMTC's Amended Complaint, and this Court should

affirm the ruling that ACCSC violated PMTC's due process and PMTC is entitled

to declaratory relief and damages. Because the District Court only ruled against PMTC on Count II due to its mistaken belief that Virginia law does not imply a duty of good faith and fair dealing in contracts, the Court should reverse the District Court's ruling and direct it to enter judgment for PMTC on Count II. The Court also should reverse the District Court's ruling on Counts IV to VI and direct the District Court to enter judgment for PMTC on those tortious inference claims, because the District Court erred in its application of Missouri law on justification and the court's finding of a biased accreditation review process clearly establishes that ACCSC's accreditation decision was the product of "improper means."

Finally, there was substantial evidence demonstrating that PMTC suffered considerable harm to its enrollments and its reputation as a result of ACCSC's improper denial of accreditation and the ensuing legal process PMTC had to pursue in order to overturn ACCSC's wrongful actions and decision. The District Court rejected the lost profits analysis and the $1,408,656 damages calculation of PMTC expert witness Gary Trugman, and awarded lower lost profits with a lower damages award of $429,016.62, only because the District Court failed to understand and apply the well-established incremental cost and profit principle utilized by Mr. Trugman and approved by the courts for many years. The Court should thus reverse the District Court's damages award and instruct it to enter an award of damages of $1,408,656, as calculated by Mr. Trugman. The Court also

should direct the District Court, in connection with entering judgment for PMTC on the tortious interference claims, to review the evidence of bias and process irregularities under Missouri law standards on punitive damages to determine whether punitive damages should be assessed against ACCSC and, if so, the amount of such damages.

Dated: July 11, 2014

Respectfully submitted,

By ____ s/ Ronald L. Holt

Ronald L. Holt, MO 30160
Matthew L. Hoppock, KS 23854
Dunn & Davison LLC
1100 Walnut, Suite 2300
Kansas City, MO 64104
(816) 292-7600 Telephone
(816) 292-7601 Facsimile
rholt@dunndavison.com
mhoppock@dunndavison.com

Attorneys for Appellee and
Cross-Appellant

**ORAL ARGUMENT REQUESTED**

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**No.** 13-2547      **Caption:** PMTC vs. ACCSC

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✔] this brief contains ____16,158____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[  ] this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✔] this brief has been prepared in a proportionally spaced typeface using
Word 2007 _____ [*identify word processing program*] in
14 Pt. Times New Roman Font _____ [*identify font size and type style*]; **or**

[  ] this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) /s/ Ronald L. Holt _____

Attorney for Appellee and Cross-Appellant _____

Dated: 7/11/2014 _____

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on July 11, 2014.

All participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have e-mailed the foregoing document on July 11, 2014 and sent by First-Class Mail, postage prepaid on July 11, 2014 to the following non-CM/ECF participants:

Dated: July 11, 2014          By  s/ Ronald L. Holt